# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYNOPSYS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>AZURENGINE TECHNOLOGIES, INC., et al.,<br><br>Defendants. | CASE NO. 19cv1443-LAB (AGS)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, EXPEDITED DISCOVERY, AND ORDER TO SHOW CAUSE [Dkt. 4]** |

Currently before the Court is Plaintiff Synopsys, Inc.'s Motion for (1) a Temporary Restraining Order; (2) an Order to Show Cause re: Preliminary Injunction; and (3) an Order for Expedited Discovery. Dkt. 4. For the reasons below, that motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

**1.  Synopsys' EDA Software**

Synopsys is one of the world's leading producers of Electronic Design Automation ("EDA") software, which are tools used by microchip manufacturers to design, verify, and simulate the performance of electronic circuits. Synopsys offers a suite of EDA tools that are the result of "hundreds of millions of dollars of investment as well as years of Synopsys' time." Dkt. 4 ("TRO") at 3.

/ / /

Synopsys does not sell ownership, copyright, or other intellectual property rights to its EDA software. Instead, the company permits access to its tools only through customized licenses that grant the purchaser limited rights. Synopsys employs strict controls that monitor and limit access in accordance with each licensee's specific terms. The central feature of these access-control measures is a license key system that requires licensees to input an encrypted key code that can only be obtained from Synopsys. The system monitors a licensee's use of the software to ensure compliance with the licensee's specific contract terms.

**2.     AzurEngine's Alleged Infringement**

AzurEngine is a San Diego-based startup founded in 2016. The company's stated mission is to develop "a state-of-art reconfigurable processor for next generation deep learning technologies." *Id.* at 5. By all accounts, AzurEngine has moved quickly to meet that goal. It developed its first prototype chip within one year of its founding, and has since embarked on a "major multi-million dollar chipset design project" with an unnamed Chinese business partner. Dkt. 7 ("Opp.") at 2.

Beginning in June 2019, Synopsys' monitoring programs detected "call-home data" indicating that individuals associated with AzurEngine—a company with no current license from Synopsys—had impermissibly accessed its EDA software. According to Synopsys, this call-home data indicates that AzurEngine has used counterfeit license keys to circumvent Synopsys' software protections more than 15,000 times. For its part, AzurEngine says it believed it had permission to access Synopsys software because its Chinese business partner "purported to provide AzurEngine with valid licensed access to the Synopsys software." *Id.*

## ANALYSIS

Synopsys claims that AzurEngine's unauthorized use of its software constitutes a violation of the Digital Millennium Copyright Act ("DMCA"). It seeks a temporary restraining order enjoining AzurEngine from further accessing its software. It also seeks

expedited discovery and an order instructing AzurEngine to show cause why a preliminary injunction shouldn't be entered against it.

**1.      Temporary Restraining Order**

The standard for obtaining a temporary restraining order is identical to the standard for obtaining a preliminary injunction, with the primary difference being duration: preliminary injunctions remain in force throughout the litigation, while TROs, which are traditionally entered on an *ex parte* basis, are limited to 28 days. *See* Fed. R. Civ. Pro. 65(b)(2). To obtain either form of relief, Synopsys must establish "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Each of these factors is met here.

**a.      Synopsys Is Likely to Succeed on the Merits.**

To prevail on its claim for relief under the DMCA, Synopsys must prove that (1) its software included a technological measure that effectively controls access, (2) AzurEngine circumvented that technological measure, and (3) the Synopsys software that AzurEngine accessed is a work protected under the Copyright Act. *See* 17 U.S.C. § 1201(a)(1)(A); *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 952 (9th Cir. 2010) (Congress, in enacting § 1201(a)(1)(A), "created a distinct anti-circumvention right . . . without an infringement nexus requirement.").

**i.      Synopsys' Software "Effectively Controls" Access.**

First, Synopsys' software "effectively controls" access to its suite of EDA software. The software will not run without the licensee "checking out" a license key from a server that is designed to only grant such keys to approved licensees. Every court to consider the issue has found that similar methods of license-control satisfy the "effectively controls" requirement of the DMCA, and this Court does too. *See, e.g., Synopsys, Inc. v.*

*InnoGrit, Corp.*, 2019 WL 2617091, at *3 (N.D. Cal. 2019); *Dish Network, L.L.C. v. Vicxon Corp.*, 2013 WL 3894905, at *6 (S.D. Cal. 2013).

### ii. AzurEngine Likely Circumvented Synopsys' Software Controls.

Synopsys has also plausibly demonstrated that AzurEngine circumvented its controls through the use of counterfeit license keys. These counterfeit keys work by effectively tricking the company's license-control systems into thinking AzurEngine is a licensed user. As discussed above, Synopsys' "call-home data" indicates that individuals associated with AzurEngine have circumvented its license-control system at least 15,000 times, which is 14,999 more times than would be necessary to find a violation of the DMCA. *See Synopsys, Inc. v. InnoGrit, Corp.*, 2019 WL 2617091, at *3 (N.D. Cal. 2019) (concluding that the use of counterfeit license keys, among other things, constituted "circumvention" under the DMCA).

AzurEngine's responses on this point are unavailing. It argues, for example, that its use of Synopsys software was authorized because one of its business associates—an unnamed "Chinese business partner"—had "purported to provide AzurEngine with valid licensed access to the Synopsys software at issue in this case." Opp. at 2. But even if it were true that AzurEngine had a valid license, that would not allow the company to use counterfeit keys to *circumvent* Synopsys' software protections. Even "lawful purchasers" must establish that they had specific "authorization to circumvent" in order to avoid DMCA liability. *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 863 (9th Cir. 2017). Because Synopsys has shown that AzurEngine likely circumvented its license-control systems, it is irrelevant that AzurEngine believed it had a license to use the software.

### iii. Synopsys Likely Has a Protectable Copyright Interest in Its Software Code.

Finally, Synopsys likely owns the copyrights to its EDA software, including the specific tools at issue in this case: Design Compiler, PrimeTime, VCS, Formality, IC Compiler, StarRC, and Library Compiler. Much of Synopsys' EDA software is protected

by a registered copyright, which is *prima facie* evidence of lawful ownership over the code. *See* 17 U.S.C. § 410(c). And if that weren't enough, almost all novel software code constitutes a creative, original work of authorship that is automatically protected under the Copyright Act. *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1519 (9th Cir. 1992), *as amended* (Jan. 6, 1993) ("[T]he Copyright Act unambiguously extended copyright protection to computer programs.").

### iv. Extraterritoriality is a Red Herring.

Based on the factors above, the Court concludes that Synopsys is likely to succeed on the merits of its DMCA claim. Largely conceding this, AzurEngine's opposition instead focuses on the red herring of extraterritoriality. Specifically, it argues that although it is a California-based company with engineers operating in the United States, the access to Synopsys' software occurred through its servers in China. Since the "access" technically occurred abroad, AzurEngine argues that enjoining its behavior would violate the rule against applying United States law extraterritorially.

But extraterritorial application of the DMCA is irrelevant here. As the Supreme Court has noted, "[i]f the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). The "focus" of section 1201(a)(1) is to prevent circumvention of technological measures to gain access to copyrighted works. *See* 17 U.S.C. § 1201(a)(1); *MDY Indus.*, 629 F.3d at 944-45. Using the Supreme Court's rubric from *RJR Nabisco*, there is plainly no extraterritoriality problem here. The conduct that is the focus of § 1201(a)(1)—gaining access to copyrighted works by circumventing technological access controls—"occurred in the United States," and thus application of the DMCA to AzurEngine's U.S.-based circumventions "involves a permissible domestic application [of the DMCA] even if other conduct occurred abroad." *RJR Nabisco*, 136 S. Ct. at 2101.

AzurEngine's argument has also been flatly rejected by numerous courts. Were its argument correct, "large-scale criminal copyright pirates could avoid United States

copyright liability simply by locating their servers outside the United States." *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 915 (D.C. Cir. 2018). But that's not the law. Because it's undisputed that AzurEngine's alleged DMCA violations occurred "at least in part[] in the United States," its extraterritoriality defense fails. *Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1372 (Fed. Cir. 2008).

### b. Synopsys Will Suffer Irreparable Harm in the Absence of an Injunction, and the Balance of Equities Tip in Its Favor.

A party seeking an injunction must establish that it "is likely to suffer irreparable harm in the absence of preliminary relief [and] that the balance of equities tips in [its] favor." *Winter*, 555 U.S. at 20.

In the DMCA context, irreparable harm may be established by evidence that circumvention is undermining the copyright owner's negotiating position, damaging goodwill with licensees, threatening the copyright owner's business model, risking the copyright owner's market share, causing reputational harm to the copyright owner or its works, and/or enabling third parties to infringe the owner's copyrights. *VidAngel*, 869 F.3d at 865 (examples 1-3); *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 946 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011) (examples 4-6). The evidence submitted by Synopsys shows that AzurEngine's conduct results in at least some of these harms.

The declaration submitted by Norman F. Kelly, Synopsys' Director of License Compliance, for example, supports a finding that circumvention like AzurEngine's undermines Synopsys' negotiating position with other licensees and threatens its business model. He notes in that declaration that customers have asked him "why [they] should pay for Synopsys software if [they] can get the software for free elsewhere?" Dkt. 11-1 ("Suppl. Kelly Decl.") at ¶ 16. In his estimation, this mentality causes the company to "lose hundreds of millions of dollars to piracy every year." *Id.* Circumvention also causes a loss of goodwill between paying customers and Synopsys. The companies that choose to pay for Synopsys software find themselves at a price disadvantage relative to competitors that choose to circumvent the company's controls and receive the software

for free. *Id.* at ¶ 15. According to Synopsys, this dynamic leads to an "uneven playing field" and, ultimately, loss of goodwill. The dynamic also creates downward pricing pressure, as the company's paying customers insist on lower prices to compete with non-paying pirates. *See Synopsys, Inc. v. InnoGrit, Corp.*, 2019 WL 2617091, at *3 (N.D. Cal. 2019). Such losses are difficult—if not impossible—to quantify, and thus constitute irreparable harm.

The balance of the equities also tips in Synopsys' favor. On one side of the ledger is the irreparable harm to Synopsys and the strong public interest in enforcing the DMCA and federal copyright law generally. On the other side of the ledger is the, frankly, audacious claim by AzurEngine that an injunction could "be devastating" because "AzurEngine has been using the Synopsys software as a necessary and critical tool in a major circuit design project that is currently underway." Opp. at 3. Even a two-week suspension, it claims, "could cause major delays, missed milestones, and significant costs to AzurEngine." *Id.* As Synopsys correctly points out, this argument carries no weight. Any benefit AzurEngine has received from impermissibly accessing Synopsys' software was ill-gotten. That it may prefer to continue using the software doesn't mean it is entitled as a matter of law to do so. It may well be the case that AzurEngine believed its business partner had provided it with a valid license, but it is incumbent on parties to ensure they are not violating the law, not on the Court to rescue them when they've done so, and nothing prevents AzurEngine from now lawfully acquiring a license from Synopsys by paying for it.

In short, Synopsys has demonstrated irreparable harm and that the balance of equities tip in its favor.

   **c.**  **An Injunction Is in the Public Interest**

The public interest is also served by an injunction here. "[T]he public has an interest in the enforcement of . . . statutes," *Dish Network, L.L.C. v. SatFTA*, 2011 WL 856268, at *8 (N.D. Cal. 2011) (citing *Coxcom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008)), and copyright statutes are no exception. In cases related to the DMCA, courts

ordinarily presume that an injunction will serve the public interest if the copyright holder shows a likelihood of success on the merits. *See, e.g., Lilith Games (Shanghai) Co. v. UCool, Inc.*, 2015 WL 5591612, at *13 (N.D. Cal. 2015) ("If evidence of infringement is strong, then the public interest favors its abatement given that the public has an interest in seeing the copyright laws enforced."). Because the Court has already concluded that Synopsys is likely to prevail on the merits, it likewise finds that the public interest would be served by entering the injunction.

### d. TRO versus Preliminary Injunction

Having concluded that Synopsys is entitled to some form of an injunction, the Court now turns to the specifics of the remedy. As discussed above, the standards for a TRO and preliminary injunction differ only in timing—preliminary injunctions last throughout the case, while TROs may generally last no longer than 28 days. Although Synopsys requested entry of an *ex parte* TRO, the normal framework for a TRO doesn't apply here because AzurEngine is aware of the action and has had chance to submit briefing in opposition. *Cf. Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974) ("The stringent restrictions imposed . . . by Rule 65 on the availability of ex parte temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute."). Given this opportunity for briefing, the Court will instead construe Synopsys' request for a TRO as a motion for preliminary injunction. *See, e.g., VanLeeuwen v. Farm Credit Admin.*, 577 F. Supp. 264, 278 (D. Or. 1983) ("The application for a temporary restraining order will be treated as one for a preliminary injunction where, as here, defendants have been able to present their opposition.") (citing *Levas and Levas v. Village of Antioch, Ill.*, 684 F.2d 446, 448 (7th Cir. 1982)). This has the primary advantage of allowing the parties additional time for discovery. Were the Court to follow Synopsys' suggestion—that is, enter a TRO and issue an order to show cause directing AzurEngine to demonstrate why that shouldn't be converted to a preliminary injunction—the parties would be required to conduct discovery and fully brief

the order to show cause within 28 days, a tight window to say the least. Instead, the Court will enter a preliminary injunction and give AzurEngine the opportunity, at some later date, to *dissolve* the injunction. It may seem like a matter of semantics, but it's the right course of action here.

Synopsys' *Ex Parte* Motion for a TRO, construed as a Motion for Preliminary Injunction, is **GRANTED**.[1] If discovery reveals information showing that this decision is in error, AzurEngine may move to dissolve the injunction at some later date. Synopsys' Motion for an Order to Show Cause is **DENIED AS MOOT**.

**2.     Expedited Discovery**

Federal Rule of Civil Procedure 26(d) allows for discovery prior to a Rule 26(f) conference. "In the Ninth Circuit, courts use the 'good cause' standard to determine whether discovery should be allowed to proceed prior to a Rule 26(f) conference." *Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1099 (N.D. Cal. 2012). "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002). "It should be noted that courts have recognized that good cause is frequently found in cases involving claims of infringement . . . ." *Id.* "Factors commonly considered in determining the reasonableness of expedited discovery include, but are not limited to: '(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made.'" *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009) (quoting *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit*

---

[1] The Court declines to require Synopsys to post a $1,000,000 bond. The bond requirement in Fed. R. Civ. Pro. 65(c) is discretionary, especially where the plaintiff is likely to succeed on the merits and the injunction is in the public interest. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). Further, AzurEngine has submitted no evidence demonstrating why $1,000,000 is an appropriate bond amount.

*Auth.*, 234 F.R.D. 4, 6 (D.D.C. 2006)). Taken as a whole, these factors cut against permitting expedited discovery here.

**(i) Whether a preliminary injunction is pending**. Given that the Court has already determined that a preliminary injunction should issue, this factor cuts against granting expedited discovery. Further, as AzurEngine is now subject to an injunction, the company has every incentive to move to ordinary discovery quickly so that they can then move to dissolve the injunction, if appropriate.

**(ii) The breadth of the discovery requests**. Synopsys seeks to forensically image and then analyze the devices on which AzurEngine is accessing and using Synopsys software. According to Synopsys, "[t]his information is resident *only* on AzurEngine's computers and gathering it is easily accomplished by a forensic expert who can image the devices." TRO at 18 (emphasis in original). AzurEngine argues that some of the desired information may be on Chinese servers that may be difficult to access, but Synopsys correctly points out that even if some of the subject servers are in China, the U.S.-based computers used to remotely access those Chinese servers nonetheless contain valuable forensic evidence. The request for discovery is not especially broad, so this factor cuts in favor of permitting expedited discovery.

**(iii) The purpose of requesting the discovery**. The purpose of Synopsys' request for expedited discovery is "to ensure that electronic evidence that is material to this litigation is not altered, deleted, destroyed or otherwise lost in the ordinary course of AzurEngine's business." *Id.* But AzurEngine has implemented a litigation hold, *see* Dkt. 7-1 ("Li Decl.") at ¶ 7, and there is no evidence that the data is otherwise at risk of spoliation.[2] *See Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 2019 WL 2067867, at *13 (D. Minn. 2019) (denying expedited discovery where "[t]he Parties have already implemented litigation holds" and "[t]here is no evidence suggesting a risk of spoliation."). This factor cuts against granting expedited discovery.

---

[2] Even though AzurEngine claims to have implemented a litigation hold, the Court **ORDERS** the company to preserve any relevant evidence, as set out in the "Preliminary Injunction and Preservation Order" below.

**(iv) The burden on defendant**. Synopsys argues that the burden on AzurEngine is minimal because the forensic imaging can be conducted during normal business hours and that AzurEngine would be required to provide this information in the normal course of discovery regardless. Other than challenging the efficacy of Synopsys' proposed discovery methods and suggesting that the forensic imaging would be "highly disruptive," AzurEngine does not demonstrate that the requested discovery would be especially burdensome. This factor cuts in favor of expedited discovery.

**(v) How far in advance the discovery request was made**. As discussed, now that a preliminary injunction has been entered, the parties can proceed to ordinary discovery in a timely fashion. AzurEngine has every incentive to cooperate and move quickly through discovery so that it can then move to dissolve the injunction. This factor cuts against granting expedited discovery.

In all, the factors above suggest that expedited discovery is not warranted here. AzurEngine has implemented a litigation hold, which reduces any risk of spoliation, and AzurEngine has an incentive to expedite discovery without the Court setting artificial deadlines. Synopsys' request for expedited discovery is **DENIED**. All future discovery disputes will be heard by Magistrate Judge Andrew G. Schopler.

## **CONCLUSION**

Construed as a Motion for Preliminary Injunction, Synopsys' Motion for a Temporary Restraining Order is **GRANTED**. Dkt. 4. Given that the Court has entered a preliminary injunction, Synopsys' request for an Order to Show Cause re: Preliminary Injunction is **DENIED AS MOOT**. Dkt. 4. Synopsys' Motion for Expedited Discovery is **DENIED**. Dkt. 4. To the extent relevant, AzurEngine's *Ex Parte* Motion to Supplement Its Opposition is **GRANTED**. Dkt. 9.

**IT IS SO ORDERED**.

Dated: August 15, 2019

**HONORABLE LARRY ALAN BURNS**
Chief United States District Judge

**PRELIMINARY INJUNCTION AND PRESERVATION ORDER**

The Court, having considered Plaintiff Synopsys, Inc.'s ("Synopsys") motion and the opposition thereto, and having found good cause to do so, **GRANTS** Synopsys' motion as follows:

1. The Court finds that Synopsys is entitled to a preliminary injunction. Synopsys is likely to succeed on the merits of its claim that AzurEngine Technologies, Inc. ("AzurEngine") has violated the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §§ 1201 et seq;

2. The Court further finds that unless an injunction is granted, irreparable harm will result to Synopsys; and

3. The Court further finds that that the balance of equities tip in Synopsys' favor, and that an injunction is in the public interest.

**IT IS HEREBY ORDERED** that defendant AzurEngine, its representatives, officers, agents, directors, affiliates, servants, employees, and all persons acting in concert or participation with it, including employees and independent contractors, are enjoined from directly or indirectly accessing, using, transferring, or copying, in any way, any Synopsys software, including but not limited to Synopsys' Design Compiler, PrimeTime, VCS, Formality, IC Compiler, StarRC Extraction, and Library Compiler applications, without authorization from Synopsys.

**IT IS FURTHER ORDERED** that defendant AzurEngine, its representatives, officers, agents, directors, affiliates, servants, employees, and all persons acting in concert or participation with it, including employees and independent contractors, shall immediately preserve all evidence that may relate to this matter, including all hard copy materials and all computer hard drives and other electronic devices in their possession, custody, or control.

**IT IS SO ORDERED.**

Dated: August 15, 2019

**Honorable Larry Alan Burns**
Chief United States District Judge